IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TONI JACKSON, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>JERSEY COMMUNITY HOSPITAL, and CONSUMER COLLECTION MANAGEMENT, INC.,<br><br>    Defendants. | Case No. 3:21-CV-00848-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

A lingering medical bill from Defendant Jersey Community Hospital ("JCH") haunted Plaintiff Toni Jackson for years after her August 2018 visit. During that appointment, Jackson provided her Medicaid insurance information to JCH with the understanding that any resulting bill would be submitted to Medicaid. JCH sent Jackson four statement notices within the following four months featuring a $321.00 unpaid balance from the August visit. While confused by the notices, Jackson assumed that JCH would bill her insurance as she was told.

After the four notices, JCH wrote off the outstanding balance and sent the account to a debt collection service, Defendant Consumer Collection Management, Inc. ("CCM"), in January 2019. At that time, CCM began reporting the debt to credit agencies before the initial "dunning letter" expired (a practice commonly called "debt parking"). Skipping

ahead to April 2019, JCH billed Medicaid for the debt. On Jackson's behalf, Medicaid paid the outstanding $321.00 debt to JCH in early May 2019. JCH received payment in-full but failed to prevent CCM from attempting to collect the newly invalid debt. CCM persisted in reporting the invalid debt on Jackson's credit report from May 2019 to May 2021.

Jackson first became aware of the persistent reporting when she applied for a home loan in 2020. Her credit score took a nosedive, which prevented her from receiving the loan. After this worrisome discovery, Jackson confronted CCM, as did a Medicaid representative, to explain that her medical debt had already been paid. CCM met these appeals with inaction—CCM did not update the account details, delete the account, or properly mark the account as disputed. Jackson was forced to pay a credit repair company to mitigate the devastating hit to her credit score.

Overall, Jackson tells the story of a nefarious scheme crafted by JCH and CCM to unlawfully generate revenue by double collecting on already paid medical bills. The Court previously dismissed Jackson's RICO claims against JCH and CCM, as well as her claim against JCH under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). (Doc. 43). After dismissal, Jackson amended her complaint. (Doc. 44). In the Second Amended Complaint, Jackson discarded her RICO claim but attempted to cure the deficiencies in her ICFA claim against JCH reflected in Count V. (*Id.*). As with the previous ICFA claim, JCH moves to dismiss Count V for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 48). Separately, CCM moves for an order pursuant to Federal Rule of Civil Procedure 23 striking the class allegations asserted by Jackson. (Doc. 45). Jackson filed timely responses to each motion. (Docs. 51, 54). JCH filed a

timely reply to Jackson's response. (Doc. 55).

**DISCUSSION**

**I.    JCH's Motion to Dismiss Count V (Doc. 48)**

    **a. Legal Standard—Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6); *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, a plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The purpose of a Rule 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case or decide whether a plaintiff will ultimately prevail. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).

In deciding a motion to dismiss under Rule 12(b)(6), a court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012). In doing so, the court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Taken together, the factual allegations contained within a complaint must "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted).

### b. Analysis

Jackson amended her claims against JCH for violation of the ICFA, which prohibits unfair or deceptive acts or practices—including the use of deception fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact—with intent that others rely upon such action, representation, or omission. 815 ILCS 505/2. To state a claim under the ICFA, a plaintiff must demonstrate: "(1) a deceptive or unfair act or promise by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014). In conjunction with these requirements, the plaintiff must show that he or she was actually deceived and that the defendant's misrepresentation proximately caused his or her injury. *See O'Connor v. Ford Motor Company*, 477 F. Supp. 3d 705, 720 (N.D. Ill. 2020) (citing *De Bouse v. Bayer*, 922 N.E.2d 309, 316 (2009)); *Siegal v. GEICO Casualty Co.*, 523 F. Supp. 3d 1032, 1041-42 (N.D. Ill. 2021). An omission, under the ICFA, must be from a communication, rather than a general failure to disclose. *O'Connor*, 477 F. Supp. 3d at 720.

As explained in the Court's Order on JCH's first Motion to Dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief" sufficient to provide the defendant fair notice of the claim. FED. R. CIV. P. 8(a)(2); *Twombly*, 550 U.S. at 555. But allegations of fraud fall into an exception and face a higher pleading standard. Rule 9(b) requires a plaintiff to state "with particularity" any "circumstances constituting fraud." FED. R. CIV. P. 9(b). These circumstances "include the

identity of the person who committed the fraud, the time, place, and content of the fraud, and the method by which the fraud was communicated to the plaintiff." *Stemm v. Tootsie Roll Industries, Inc.*, 374 F. Supp. 3d 734, 739 (N.D. Ill. 2019).

Sound policy inspires these requirements. Elevated pleading standards force the plaintiff to engage in a pre-complaint investigation so that charges of fraud are actually responsible and supported, rather than defamatory and extortionate. *Camasta*, 761 F.3d at 738. Ideally, the heightened pleading standard preserves a defendant's reputation, minimizes fishing expeditions, and provides notice to the adverse party. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). The heightened Rule 9(b) standard applies to Jackson's ICFA claim in Count V against JCH.

In her Second Amended Complaint, Jackson alleges that JCH communicated, represented, or promised that she would not owe anything for her August 2018 visit and that her incurred medical expenses would be submitted to Medicaid. In its motion to dismiss, JCH emphasizes that Jackson failed to plead this allegation with particularity as to who exactly at JCH conveyed these promises to her. Moreover, JCH argues that the alleged promise was not false or deceptive, because eventually JCH did bill Medicaid, and Jackson owed nothing to JCH. Further, JCH urges that simply failing to keep a promise does not rise to the level of a deceptive practice under the ICFA, as every run-of-the-mill breach of contract claim would necessarily devolve into consumer fraud claims.

Jackson also alleges that JCH sent statement notices in September, October, November, and December 2018 representing the unpaid balance, submitted her account

to CCM for debt collection, and billed Medicaid months later to recuperate the debt. In response, JCH explains that its communications appropriately represented a valid, unpaid debt at the time. To sufficiently allege a misrepresentation, JCH claims that Jackson must identify a false or deceptive communication *after* Medicaid fully covered the debt, when a valid debt no longer existed.

Jackson's complaint also details a principal-agent relationship between JCH and CCM. She alleges that JCH communicated, or failed to communicate, with her through its agent—CCM. Jackson asserts that, through CCM, JCH communicated that she owed a valid debt, even after JCH received payment from Medicaid, and neglected to inform her that the debt had been satisfied. In response to this line of allegations, JCH contends that Jackson fails to plead specific facts evidencing the existence and scope of any purported agency relationship between itself and CCM. According to JCH, the complaint is devoid of examples of communications from CCM after May 2019, when Medicaid paid Jackson's debt. JCH also accuses Jackson of relying on conclusory allegations of agency and the exercise of control over CCM, which are insufficient to substantiate a fraud claim. JCH lastly argues that Jackson failed to plead proximate cause and actual damages as required to state a claim under the ICFA.

Here, JCH tugs on a specific line of logic—that Jackson can only demonstrate a deceptive practice if JCH communicated that she owed money *after* Medicaid paid, and JCH fooled her into paying an already satisfied debt—to unravel Jackson's ICFA claim. From the Court's reading, Jackson's complaint actually points to a different deceptive communication to satisfy the elements of her claim. Jackson identifies the relevant

communication as JCH's representation, during her August 2018 appointment or possibly in an earlier appointment, that JCH accepted Medicaid and would bill Medicaid for services rendered to her as someone insured by Medicaid, a unique and specific type of insurance. JCH intended for her to rely on this representation so that she would elect to receive services at JCH, which would obviously generate revenue. Jackson then relied on this representation in choosing to become a patient at JCH. She further relied on the representation when she received JCH's statement notices displaying an outstanding bill. Because of JCH's assurances, she believed that the statements required no action and Medicaid would be properly billed to cover the cost of services amassed at JCH. Thus, her reliance on JCH's representations caused her to receive services at JCH and misconstrue the subsequent statement notices. JCH then sent her account to CCM, which triggered multiple dings on her credit report causing her financial harm. And shortly after, JCH billed Medicaid, received full payment, failed to call off its debt collector, and allowed CCM to persist in chasing down Jackson, possibly for a double payday.

Woven together, Jackson alleges a story with multiple deceptive representations and actions by JCH. She certainly alleges more than a broken promise, as characterized by JCH. She alleges direct misrepresentations from JCH about Medicaid billing and that JCH's conduct in deliberately choosing to send statement notices to Jackson rather than bill Medicaid, represent the balance as unpaid, submit her account to CCM for debt collection, and then bill Medicaid months later represent a deceptive practice designed to coerce her into paying an invalid debt.

As for the agency relationship with CCM, Jackson alleges that JCH sent her account

to CCM and controlled and directed CCM's actions in recovering the debt, including permitting CCM to continue its efforts after Medicaid satisfied the debt. Further, following JCH's preferred line of logic, Jackson asserts that CCM communicated with her *after* Medicaid paid JCH through collection notices and credit reporting. Taking all well-pleaded factual allegations as true and construing all inferences in favor of Jackson, the Court tends to agree that Jackson sufficiently alleges an agency relationship between JCH and CCM, and CCM's communications with Jackson after the debt was satisfied could reflect back on JCH. *See Schutz v. Arrow Financial Services, LLC*, 465 F. Supp. 2d 872, 877-78 (N.D. Ill. 2006) (finding a principal/agent relationship between a debt owner and a debt collection agency where debt owner had the right to control content in letters mailed by the collection agency). Of course, it may come to light, during discovery, that no such agency relationship existed.

In any event, as discussed above, Jackson need not rely on these communications by CCM, as JCH's agent, to sufficiently state a claim under the ICFA, because she alleges deceptive communications directly from JCH. While these allegations lack the name of the speaker, the operative complaint permits the inference that an employee of JCH, with whom Jackson interacted during her visit on August 28, 2018, made the relevant misrepresentation. This is enough specificity at this stage. Furthermore, as outlined above, Jackson sufficiently alleges causation and actual damages to survive a motion to dismiss. Her complaint references the destruction of her credit score, financial stability, and ability to secure a home loan. Moreover, she suffered financial loss as she was forced to pay a credit repair service to undo the damage.

The Court finds that Jackson sufficiently alleged, with enough particularity, a claim against JCH for violation of the ICFA. Accordingly, JCH's motion to dismiss Count V of Jackson's Second Amended Complaint is denied.

## II. CCM's Motion to Strike Class Allegations (Doc. 45)

Jackson raises four claims against CCM for various violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, ("FDCPA") for "debt parking," falsely representing the character, amount or legal status of debts, knowingly making false credit reports, failing to communicate the disputed nature of debts, using false representation or deception to collect debts, and attempting to harass, oppress, or abuse persons in collecting debts. Congress enacted the FDCPA to eliminate abusive debt collection practices and "the many evils associated with debt collection." *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015).

### a. Legal Standard – Striking Class Allegations under Federal Rule of Civil Procedure 23

Rule 12(f) permits a court to strike an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from a pleading. FED. R. CIV. P. 12(f). For motions to strike class allegations, however, courts evaluate the request under Rule 23. *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014).

At an early practicable time after a person sues, the court must determine, by order, whether to certify the action as a class action. FED. R. CIV. P. 23(c)(1)(A). To be certified, a proposed class must satisfy the requirements of Rule 23(a) of numerosity, typicality, commonality, and adequacy of representation. FED. R. CIV. P. 23(a); *Messner v.*

*Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). After passing the Rule 23(a) threshold, a plaintiff must satisfy one of the three alternative conditions in Rule 23(b) to achieve class certification. *Messner*, 669 F.3d at 811; FED. R. CIV. P. 23(b). Plaintiffs shoulder the burden of showing that the proposed class satisfies the Rule 23 requirements, but this showing need not meet a degree of absolute certainty. *Messner*, 669 F.3d at 811.

In the class certification context, motions to strike are generally disfavored, and when the benefit of class discovery has not yet been afforded to the plaintiff, the defendant carries the burden of proving the class is not certifiable. *Advanced Dermatology v. Fieldwork, Inc.*, 550 F. Supp. 3d 555, 568 (N.D. Ill. 2021). Of course, a court may deny class certification even before the plaintiff files a motion requesting certification, if the complaint makes clear that class certification is inappropriate and additional discovery would offer no help in resolving the class determination. *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829 (N.D. Ill. 2013); *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). If the class certification determination rests on factual issues and hinges on discovery, a motion to strike the class allegations at the pleading stage is premature. *Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 787 (N.D. Ill. 2020).

### b. Analysis

In its motion, CCM declares that Jackson's class allegations are facially insufficient by improperly creating a "fail-safe" class and argues that the class is uncertifiable as a matter of law. Jackson's putative class definition, according to CCM, is overbroad, legally unsupported, open-ended, subjective, and cannot meet the requirements of typicality.

CCM also highlights Jackson's inability to establish that a common contention exists that could be decided on a class-wide basis. According to CCM, allowing class certification in this case would necessitate a series of individualized inquiries or "mini-trials" to vet each class member in determining whether each one has a valid claim against CCM. These inquiries would be required for the alleged issues of whether CCM attempted to collect any invalid debts, whether CCM appropriately designated JCH accounts as disputed, and whether CCM furnished account information to consumer reporting agencies before communicating with each class member. All in all, CCM argues that Jackson's theory of FDCPA violations in this case would require individual liability determinations and require the Court to impermissibly inquire into the merits of each potential class member's claim.

On the other hand, Jackson argues that CCM's practices, as set forth in the Second Amended Complaint, evidence a step-by-step formula involving conduct prohibited by the FDCPA, including tactics of "debt parking," invalid debt reporting, and failing to mark debts as disputed. At most, Jackson urges, CCM supports an argument that the class definition should be refined. Jackson also contends that she sufficiently pleads typicality, commonality, and predominance.

Noting the possibility that discovery may shape class definition(s), Jackson alleges the following class definition in her Second Amended Complaint:

> ¶ 113. The class consists of all persons whom Defendants' records reflect resided in the State of Illinois and who (a) were seen by a JCH facility; (b) who were Illinois Medicaid or Medicare recipients; and (c) who are currently recipients of debt collection attempts regarding those medical bills; (d) the Plaintiff asserts that these collection attempts are in violation of the FDCPA, and 815 ILCS 505/2.

Considering the stage of litigation, CCM's motion is premature. While Rule 23 instructs that a court determine class certification at an early practicable time, most often, the pleading stage is not a practicable time for such a determination. *Hill*, 946 F. Supp. 2d at 829. It is an exceptional situation that a complaint is so facially lacking that no amount of discovery or time could provide support for class certification to warrant striking the class allegations. *Advanced Dermatology*, 550 F. Supp. 3d at 568.

As an initial matter, the Court is unpersuaded by CCM's overbreadth arguments. Before seeking certification, the class definition can be shaped and narrowed with the benefit of discovery. The Seventh Circuit recognizes that defining a class so as to avoid being over or under inclusive is more of an art than a science. *Messner*, 669 F.3d at 825. This problem can, and typically should be, solved by refining the class definition rather than denying class certification, or striking the class allegations. *Id.*

Turning to CCM's fail-safe argument, a "fail-safe" class is one defined so that whether a person qualifies as a member depends on whether the person has a valid claim. *Id.* Such class definitions are improper because a class member either wins or, by virtue of losing, is defined out of the class, and is no longer bound by the judgment. *Id.* A fail-safe concern arises when the class is defined with explicit reference to the central legal issue in the case and membership depends on the liability of the defendant. *Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 774 (N.D. Ill. 2018). Notably, the fail-safe issue can also be solved through refining class definition rather than denial of class certification. *Messner*, 669 F.3d at 825; *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017). Here, the Court agrees with CCM that part (d) of Jackson's class definition is inappropriate in stating "the

Plaintiff asserts that these collection attempts are in violation of the FDCPA[.]" This part hinges on the central legal issue in the case and CCM's liability. But this language can be removed, and the definition can be refined. Striking class allegations due to this language is not warranted at this stage. *See McCaster,* 845 F.3d at 799-800 (class membership definition turned on whether former employee had a valid claim, but the Court resolved a fail-safe issue by eliminating the italicized portion of the class definition: "[a]ll persons separated from hourly employment with [Darden] in Illinois between December 11, 2003, and the conclusion of this action[ ] who were subject to Darden's Vacation Policy ... *and who did not receive all earned vacation pay benefits.*").

In alignment with Jackson's argument, the Court recognizes that identifying the potential issues of adjudicating Jackson's FDCPA claims as a class action is difficult without the benefit of discovery. To understand if any support exists to warrant class certification, Jackson needs the opportunity to uncover more detailed information, through discovery, such as CCM's communications and contacts with its consumer debtors (potential class members), JCH, and credit bureaus, along with its internal processes for handling accounts like Jackson's. To be sure, CCM may renew its challenge at the certification stage, or at the point in discovery it becomes clear that no possible support exists for class certification. At this time, discovery must proceed to garner more insight as to class certification. As such, CCM's motion to strike Jackson's class allegations is denied.

## Conclusion

For these reasons, the Court **DENIES** the Motion to Dismiss filed by Defendant Jersey Community Hospital. (Doc. 48). The Court also **DENIES** the Motion to Strike Class

Allegations filed by Defendant Consumer Collection Management, Inc. (Doc. 45). This case will be set for scheduling conference by separate order.

    **IT IS SO ORDERED.**

    **DATED:** September 28, 2023

                                                                 **NANCY J. ROSENSTENGEL**
                                                                 **Chief U.S. District Judge**